## ROBIE v. MYERS EQUIPMENT CO.
### Civ. No. 1265.

United States District Court,
D. Minnesota, Fifth Division.
Feb. 20, 1953.

James J. Courtney & Sons, Duluth, Minn., for plaintiff.

Harry C. Applequist, Duluth, Minn. (Dancer, Montague, Applequist, Lyons, Nolan & Nordine, Duluth, Minn., of counsel), for defendant.

DONOVAN, District Judge.

Plaintiff brought this suit as trustee to recover alleged voidable preferences transferred by the bankrupt to the defendant within four months of the filing of the voluntary petition in bankruptcy on March 13, 1952.[1]

Defendant answered, admitting the filing of the petition and the qualifying of the plaintiff as trustee. It denied generally the existence of any preferential transfers, alleging specifically that (1) the merchandise had been sold on consignment, (2) the defendant had no reasonable cause to know of insolvency at the time of any transfers, and (3) the right to a set-off against any proved preferences.[2]

The issues are simply these:

(1) Was the merchandise in question delivered to bankrupt on consignment?

(2) Did defendant, at the time of receiving each transfer, have reasonable cause to believe that a preference was. being effected?

(3) In the event any or all such transfers are deemed preferential, is the defendant entitled to any set-off?

The facts conform to the usual pattern in this type of case. In or about the year 1942, defendant's vice president in charge of sales became acquainted with the bankrupt, Gerald R. Hennings, who, during the times we are herein concerned with, was doing business as Hennings Piano Company, selling pianos and merchandise kindred to that endeavor.

1. The pertinent part of Section 60 of the applicable statute, 11 U.S.C.A. § 96, reads as follows:

"Preferred creditors

"(a) A preference is a transfer * * * of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition in bankruptcy, * * * the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class. * * *

"(b) Any such preference may be. avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent. Where the preference is voidable, the trustee may recover the property * * * ."

2. There is no serious issue as to insolvency. As defendant states in argument, the bankrupt was so miserably insolvent on December 31, 1951, there can be no question but what he was so insolvent for some appreciable time before that.

Some time during the summer of 1951, defendant was looking for office equipment for a branch office and was told that Hennings had some for sale. Defendant's agent called at Hennings' store to inquire of him as to whether he had such equipment for sale and Hennings incidentally expressed interest in defendant's television sets. On September 26, 1951, defendant wrote to Hennings, outlining the terms under which delivery of such sets would be made. Quotations from that letter pertinent to the instant case are set forth in the margin.[3] Delivery by defendant of television sets and boosters to Hennings followed from time to time with accompanying invoices, which warrant description.

On September 30, 1951, after the first delivery, defendant billed the bankrupt on a regular "account rendered" statement for the sum of $839.77, which represented the sale of three Kaye-Halbert T-V sets and two boosters. Only one of the invoices attached to the statement, however, had any notation of "consignment", namely No. 2896, covering a planter set (074B). This invoice, identified as a memo, contained no price listing, and did not appear as a charge or credit on the statement.

On October 22, 1951, preceding additional deliveries to the bankrupt, the defendant wrote another letter outlining terms, pertinent portions of which are set out below.[4]

On November 30, 1951, defendant billed the bankrupt, this time for $3,276.44, covering October and November transactions. Only two of the attached invoices had any notation of "consignment", namely invoice No. 2941, which is a credit memo covering planter set 074B and invoice No. 2942, covering a Kaye-Halbert set 077. Neither of these invoices contained a price listing or appeared as a charge or credit on the statement.

On December 31, 1951, defendant billed bankrupt for the sum of $5,805.93. None of the attached invoices (totaling $8,305.93) had any notation of "consignment." The last billing of the bankrupt by defendant was March 10, 1952 (three days before the petition was filed). The statement apparently covered the intervening transactions between the previous statement and this last date, although the statement itself shows only a balance. Examination of the invoices for this period discloses that only one invoice, No. 3156, had any significant notations. This invoice covered a Kaye-Halbert set 064B and was marked "memo only", "special display." No price was listed; however, this memo is identified as a charge on the statement for $602. The March 10th statement also shows a credit

3. "We never sell the planter models to dealers as they are slow sellers and we use them only to command attention. As I explained to you yesterday this is a good deal for the dealer as we always retain all of the investment in planters and in this way we can give you a variety by rotating the various styles of planters among our dealers.

"All of our other sets are billed at dealer net billing and this includes tax and warranty in one lump sum which as you know is less complicated. We require payment on these within 30 days after you receive them if they are still unsold by you. We also require payment on these immediately as each set is sold by you during this 30 day period because we do not pass title and the warranty certificate on any sets until payment is received by us and you might consider the stock is consigned to you. Please do not sell a planter model without first getting our approval as we bill these unpriced on a memo basis only and it is quite an expense for us to to replace these at current prices.

"I know you are not enthused about our credit terms but like I told you every line has its drawbacks and ours happens to be short credit * * *."

4. "You have agreed to buy all of our wholesale floor models except our planters as your initial stock * * *.

"Our terms which you are familiar with are unchanged except that on this one deal in accordance with your request we require only half of these floor samples to be paid for within 30 days if still unsold by you and the other half within 15 days later or a total of 45 days on the second half. You are of course to pay us immediately for any sets sold during this 45 day period as each set is sold according to our regular terms."

for merchandise returned in the amount of $3,324.92, but significantly no mention is made of any "consigned stock."

The undisputed evidence shows, in addition, three payments by check, one for $2500, dated December 17, 1951, and two for $1,000 dated February 18, 1952, and February 28, 1952, respectively, and all bearing the notation, "on account."

Bearing in mind that at no time was a formal agreement executed by Hennings and defendant, can it be successfully claimed that the foregoing facts and circumstances in effect established a consignment? On the contrary the record does not support the theory of consignment, but rather bespeaks a debtor-creditor relationship.[5] The cases cited by the defendant in support of its contention furnish a factual distinction from the instant case.[6]

The next issue is whether the defendant, at the time of receiving each transfer, had reasonable cause to believe that a preference was being effected. The transfers in particular consist of the said three payments to defendant by check, and one transfer of merchandise and fixtures.

Considering the first transfer of $2,500 on December 17, 1951, and mindful that the plaintiff has the burden of proof, the Court fails to find sufficient evidence in the present record to show that as to this particular transfer the defendant had reasonable cause to believe the bankrupt was insolvent. As to the other transfers, however, there are sufficient facts shown to "incite a man of ordinary prudence" to a diligent inquiry.

In January, 1952, defendant was told by the bankrupt that his "Christmas collections" were slow. At all times, of course, bankrupt's account with defendant was delinquent, and there is evidence to indicate that defendant was aware that other creditors were pressing for payments. As a result of such pressure, the bankrupt issued a number of checks, one of which was to the defendant in the sum of $5,500, drawn upon the Western Bank of Duluth. At the time of issuance, bankrupt asked defendant's bookkeeper to wait a few days before depositing this, but when deposited on February 5, 1952, it was not honored.

This incident was followed by the bankrupt's offer to issue post-dated checks in the sum of $1,000 each for the balance of some $7,000, which offer was accepted by defendant and two of these checks, dated February 18th and 25th, 1952, respectively, were cashed and are alleged by the plaintiff to have been preferential transfers.

As to the transfers of merchandise, fixtures and equipment the record (plaintiff's exhibit 11) shows that the credits given to the bankrupt by the defendant were on and after January 21, 1952.

5. Ramey-Milburn Co. v. Eaves, 8 Cir., 283 F. 776; Reliance Shoe Co. v. Manly, 4 Cir., 25 F.2d 381; Liebowitz v. Voiello, 2 Cir., 107 F.2d 914; Sutton v. Baker, 91 Minn. 12, 97 N.W. 420, 421.

As said by Mr. Justice Jackson in Corn Exchange National Bank & Trust Co. v. Klauder, 318 U.S. 434, 438, 441, 63 S. Ct. 679, 682, 87 L.Ed. 884:

"* * * for thirty-five years Congress has consistently reached out to strike down secret transfers. * * *. Against such a background, § 60, sub. a, was drawn * * *. Secrecy has the effect of inducing others to go along * * * where they would not do so if informed."

6. Ludvigh, Trustee, v. American Woolen Co. of N. Y., 231 U.S. 522, 34 S.Ct. 161, 58 L.Ed. 345, concerned a written agreement of consignment expressly reserving title to consignor.

In re Sachs, 4 Cir., 30 F.2d 510. A formal consignment contract involved.

Rockmore v. American Hatters & Furriers, Inc., 2 Cir., 15 F.2d 272. A "trust receipt" expressly declared delivery was on consignment.

Kemp-Booth Co. v. Calvin, 9 Cir., 84 F.2d 377, 381. The issue involved was whether the contract between bankrupt and creditor was a conditional sale or consignment, the Court saying "That a consignment relationship is contemplated and spoken of in the contract is clear."

Sandack v. Tamme, 10 Cir., 182 F.2d 759. The memorandum with the shipment definitely stated the goods itemized were billed on consigned memorandum and title reserved in consignor.

Norris v. Boston Music Co., 129 Minn. 198, 151 N.W. 971, L.R.A.1917B, 615. The case involved a contract that was clearly one of consignment.

Consideration of the evidence in respect to defendant's knowledge of the bankrupt's insolvency at the time he made the payments herein sought to be recovered by plaintiff leads the Court to the conclusion that defendant had no actual knowledge thereof, but constructive knowledge is sufficient under the rule of prudence adopted by the courts as a yardstick to be used in measuring the facts to determine whether a creditor had reasonable cause to believe that a preference was being effected.[7]

Do the facts of the instant case constitute reasonable cause for belief by defendant that a preference would result by its acceptance of said payments and credits from the bankrupt? This is a fact question.[8]

From the above analysis of the evidence it cannot be disputed:

that the credits, payments and transfers here, in question were made within four months before the filing of the petition in bankruptcy;

that at the time thereof the bankrupt was insolvent;

that the effect of said transfers was to give the defendant a greater percentage of its debt than other creditors of the same class.

Granting that defendant did not have actual knowledge of Hennings' financial difficulty (which the Court accepts as true), the cogent facts were such as to incite one of ordinary prudence to an inquiry that would lead to a disclosure of the bankrupt's insolvency. Had defendant been a subscriber (which it was not) to the service of the financial report which it offered in evidence, it would have observed that the bankrupt on two previous occasions had found his liabilities exceeding his assets, and that he was obtaining his "merchandise on a consigned basis." (See defendant's exhibit C.) That defendant's agent actually believed Hennings to be solvent is not the controlling criterion, if the facts available would impress a reasonably prudent person to the contrary. If the creditor prefers to draw inferences favorable to self and to ignore facts available by diligent inquiry that would disclose the debtor to be in failing circumstances, he cannot adopt his own judgment to the contrary, even though honestly entertained, as a basis for retaining a prohibited advantage over other creditors. Knowledge by defendant of dishonored checks which were issued by the bankrupt to the preferred creditor is evidence of the bankrupt's lack of ready cash and inability to meet existing indebtedness.[9] A post-dated check accepted in payment of a note has not only been held "a voidable preference", but also an estoppel to the creditor's right of set-off.[10]

The weight of authority supports the rule that proof of facts shown to exist at the time of payment which would prompt a person of ordinary prudence under similar circumstances to make diligent and searching inquiry leading to knowledge of the bankrupt's financial difficulty, constitutes reasonable cause to believe that a preference would result by said creditor's acceptance of such payment.[11]

The general rule here applicable was long ago adopted by the Court of Appeals for the Eighth Circuit in these words:

"Notice of facts which would incite a man of ordinary prudence to an inquiry under similar circumstances *is notice of all the facts* which a reasonably diligent inquiry would disclose." [152 F. 953] [Emphasis supplied.] [12]

7. Coder v. McPherson, 8 Cir., 152 F. 951, 953.

8. Kaufman v. Tredway, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190.

9. Brown Shoe Co. v. Carns, 8 Cir., 65 F. 2d 294, 297; Hanson v. Shank, 159 Minn. 278, 198 N.W. 804, 805.

10. In re Starkweather & Albert, D.C.Mo., 206 F. 797; Traders' Nat. Bank v. Campbell, 14 Wall. 87, 81 U.S. 87, 20 L.Ed. 832; 3 Collier on Bankruptcy, 14th Ed., p. 1054.

11. Coder v. McPherson, supra; Coleman v. Decatur Egg Case Co., 8 Cir., 186 F. 136; Hanson v. Shank, supra.

12. Coder v. McPherson, supra.

■■ Mere suspicion that a preference is being effected is admittedly insufficient. Knowledge of dishonored checks and like information, however, is evidence tending to show reasonable cause for belief in that respect, and charges the creditor with notice.[13]

■ At the time the bankrupt issued his check for $5,500 to defendant, he requested defendant to hold the check for a few days, and when deposited on February 5th it was not honored. This was followed by bankrupt's offer to issue post-dated checks in the sum of $1,000 for the balance of some $7,000 in lieu of the check that "bounced." Defendant's bookkeeper was asked by the bankrupt to delay cashing the $5,500 check until sufficient funds were on deposit to meet it, but overlooked earmarking it for that purpose. Defendant's agent was in its office the day this check was returned dishonored. The Court does not question the good intentions of defendant in not being too inquisitive and in relying on the customer's personal financial statement, but, as pointed out and emphasized by respectable authority, this is not sufficient to avoid an effected preference.[14]

Consideration of the above facts and circumstances, and the authorities cited, leads the Court to the conclusion that the plaintiff has sustained the burden of proof in his claim that the two transfers of $1,000 each and the transfer of merchandise, stock, et cetera, were preferential. As stated, supra, plaintiff has not sustained the burden as to the $2,500 transfer.

Defendant further contends that even if payments to it are held preferential, it is entitled to credits for merchandise sold subsequent to said payments and which correspondingly increased the bankrupt's estate.[15] Plaintiff opposes this claim of set-off as inconsistent to defendant's claim that the goods in question were consigned —not sold, and further, that the estate received none of it, either before or after the preference was effected. Plaintiff also argues that no credit was extended to the bankrupt subsequent to February 28, 1952.

The credit, in order to entitle the creditor to set-off, must be extended subsequent to the preferential transfer. Such credits may be set off only against antecedent preferential payments and not against such as may have been made after the extension of the new credits.[16] The preponderance of the evidence does not support defendant's contention in the foregoing respect.

The Court is not persuaded that defendant should prevail on its claim of set-off.

Plaintiff may submit findings of fact, conclusions of law, order for and form of judgment in conformity with the above, and upon proper notice to defendant.

Each party is allowed an exception.

---

13. Brown Shoe Co. v. Carns, supra; Canright v. General Finance Corporation, 7 Cir., 123 F.2d 98; II. D. Lee Co., Inc., v. Bostian, 8 Cir., 187 F.2d 942.

14. In Dokken v. Page, 8 Cir., 147 F. 438, 439, 440, the Court, among other things, said:
"* * * they [creditors] cannot stop their ears and shut their eyes * * * to * * * escape the statute by * * * saying: 'I did not know the vendor was bankrupt. He did not so inform me; and I did not ask him. I did not know about his creditors, as I did not examine his books. I did not take an inventory of the goods or carefully examine them, as I had a general knowledge of their character, and did not look further'—and the like. * * * To protect his purchase the burden rests upon him to show

* * * that he did not know or have reason to believe that the vendor was insolvent."
To the same effect, see Canright v. General Finance Corporation, D.C.Ill., 35 F. Supp. 841.

15. Section 60, sub. c. of the Bankruptcy Act, 11 U.S.C.A. 96, sub. c, provides:
"If a creditor has been preferred, and afterward in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy may be set off against the amount which would otherwise be recoverable from him."

16. 3 Collier on Bankruptcy, 14th Ed., p. 1055, footnote 5, et seq.; Kaufman v. Tredway, supra.